CASE 21.—ACTION BY J. C. ARMSTRONG AGAINST THE LOUISVILLE, HENDERSON & ST. LOUIS RAILWAY COMPANY.—February 24, 1910.

## Louisville, H. & St. Louis Ry Co. v. Armstrong

Appeal from Breckinridge Circuit Court.

W. S. CHELF, Judge.

Judgment for plaintiff, defendant appeals.—Affirmed.

1. Master and Servant—Injuries to Servant—Sufficiency of Evidence—Assumption of Risk.—In a servant's action for injuries, while operating a jack in pulling a pile, by the breaking of a link by which the power was applied after plaintiff had told his foreman that the link was breaking and was directed to continue the work, evidence held to show that the danger from the link was not so obvious that one of ordinary intelligence would not have continued the work when directed to do so.

2. Master and Servant—Injuries to Servant—Unsafe Appliances—Assumption of Risk.—A servant does not assume the risk of injury from appliances which are not reasonably safe unless the danger in continuing to work with the appliances is or ought to be apparent to him.

3. Master and Servant—Injuries to Servant—Assumption of Risk—Work Under Master's Direction.—Where the master is present and orders the servant to proceed with the work after the latter has complained that an appliance is defective, the doctrine of assumed risk does not apply, though the danger in continuing the work is as well known to the servant as to the master, unless it was obviously and clearly dangerous to do so, which the servant knew.

4. Master and Servant—Injuries to Servant—Jury Question—Assumption of Risk.—In a servant's action for injuries, while pulling a pile with a jack, by the breaking of a stirrup thereon, by which the power was applied, after plaintiff had told his foreman that the stirrup was breaking and was directed to continue the work, whether plaintiff assumed the risk in continuing the work held a jury question.

5.  Master and Servant—Injuries to Servant—Instructions—
Assumption of Risk.—In a servant's action for injuries while
operating a jack used in pulling a pile by the breaking of a
stirrup on the jack, the court instructed that if the stirrup
was breaking and plaintiff was assured by his superiors
that it would hold until a new one was furnished and was
ordered to continue the work and he did so, relying upon
their superior knowledge. and was injured by the stirrup
breaking, the fact that he continued to work would not pre-
vent recovery unless the dangerous condition of the stirrup
was manifest to one of ordinary prudence, in which case
plaintiff was not justified in continuing the work and could
not recover.  Held, that the instruction was proper upon the
issues submitted.

6.  Damages—Personal Injuries—Excessive Damages.—A servant
.when injured, was about 21 years old, robust, in good health,
and with a prospect of many years of good health, and then
weighed about 170 pounds, but some 14 months thereafter
weighed only 140 pounds.  His right kidney was severely
injured, and several of his ribs were dislocated, and the
weight of the medical evidence was that his strength had
been permanently impaired by the injuries.  Held, that a
verdict of $5,000 was not excessive.

MILLER & TODD, T. L. EDELEN and LINDSAY & EDELEN
for appellant.

MURRAY & MURRAY and HENRY D'H. MOORMAN for appel-
lee.

OPINION OF THE COURT BY CHIEF JUSTICE BARKER—
Affirming.

In 1907 the appellant company was engaged in the
construction of a bridge over Salt river, and the ap-
pellee was a laborer in its employ.  In driving the
piles for the construction of the foundation, it was
found that one of them had been driven crooked,
and it became necessary to pull it out in order to
straighten it.  The mechanical device used for this
purpose was what was known as a "ball-bearing
jack," an instrument by which direct pressure be-

ing exerted against an endless screw very heavy weight is lifted by constant application with comparatively little effort on the part of the operator. The application of the power to the pile desired to be pulled out was made by means of a link or stirrup made of iron attached to the pile at one end and to the jack at the other. While the appellee, in company with a colaborer, was engaged in working the jack, the iron link broke, causing the handle of the jack to strike appellee in the side, throwing him from the little platform upon which he was standing into the river. In this action to recover damages for the personal injuries thus sustained, he recovered a verdict for $5,000, the judgment upon which we are asked to reverse for two reasons: First, because appellee continued to work the jack after he discovered the defective condition of the link of iron, and with knowledge of the fact that if it broke he would be injured; and, second, that the verdict is excessive.

The appellee was an intelligent, capable young man. He was in a general way familiar with the work in which he was engaged, although he had only once before worked with a ball-bearing jack, and did not know what strain the link would bear or what strain was being put upon it. He probably knew that if the link of iron broke, it would injure him. To avoid the effect of his knowledge of the danger attending the prosecution of the work with a defective link, he relies upon the assurance of safety to him by his surperiors, Boling and Brashear, who were present when the accident occurred. We may at the outset say that, except for the assurances of the master, appellee would not under the circumstances disclosed by the evidence be

entitled to recover; and so, whether or not the contention of counsel for appellant upon this point is well taken, depends upon the facts proven, which we will relate with some particularity.

Appellee testifies that when he noticed the stirrup breaking, he then told Boling, who was present, that the stirrup was breaking, and that Boling told Brashear, the superintendent of the work, who was present, the condition of the stirrup, and Brashear said to go ahead with that one until a new one that was being made at the shop was finished. Asked if he knew when he saw the stirrup breaking how much strain it would stand, he said he had no idea about it at all, but that after his superiors said to go ahead he continued to work, thinking they knew more about it than he did as they had had experience and he had not in matters of that kind; that he did not know that there was any danger in continuing to work after the direction was given to him, and that except for the direction to continue he would have quit before it finally broke. John Miles, a witness who was present said that he heard Armstrong tell Boling that the stirrup was breaking, and that Boling turned to Brashear and repeated to him what Armstrong said: that Brashear said ''to go on, that he thought the stirrup was sufficient to hold until they could get another one that was being made in a blacksmith shop at that time.'' Bromfield, another witness, who was also present testified to substantially the same thing as Miles. James Boling, the bridge foreman, testifies that Armstrong called his attention to the fact that the stirrup was breaking, and that he informed Brashear, who was present, of what Armstrong said; and that Brashear directed

them to use it until the other one that had been ordered came; that he then told Armstrong to go ahead and use it, but to be careful, that it was likely to break. But he further said that he did not think it would break as soon as it did, or that it would be dangerous to work it if care was exercised; that he saw the break in the stirrup to which Armstrong called attention. Brashear, who testified in behalf of the company said that his attention was not called to the break, and that he did not make the statements attributed to him by Boling and others. One or two other persons who were present also said that they did not hear the remarks that passed between Armstrong, Brashear and Boling.

It thus appears that appellee, although not sure that it was dangerous to continue the work, felt some uneasiness about it, and for that reason called the attention of his foreman to the situation, and that he continued to work because of the direction and assurance given to him by his foreman. As the foreman himself testifies that he did not think the stirrup would break as soon as it did, or before a new one could be obtained, it may fairly be inferred that the condition was not so obviously dangerous as that a person of common understanding and ordinary intelligence would not have continued the work. And so the principle announced in Wilson v. Chess & Wymond Co., 117 Ky. 567, 78 S. W. 453, 25 Ky. Law Rep. 1655; Shemwell v. Owensboro & Nashville R. Co., 117 Ky. 556, 78 S. W. 448, 25 Ky. Law Rep. 1671; Duncan v. Gernert Bros. Lumber Co., 87 S. W. 762, 27 Ky. Law Rep. 1039, and other like cases, does not apply.

It was the duty of the master to furnish for the use of Armstrong reasonably safe appliances with

which to work, and the failure to do this was actionable negligence, unless the danger in continuing the work was so apparent that under the rule announced in the cases cited the servant assumed the risk. But the doctrine of assumed risks in cases like this does not obtain when the master is present, and the servant is ordered under his eye and by his direction to proceed with the work, although the risk or hazard in prosecuting it is as well known to the servant as it is to the master, subject always to the exception that the master may excuse himself upon the ground that the work was obvious and clearly dangerous and so known to be by the servant. We said in City of Owensboro v. Gabbert, 135 Ky. 346, 122 S. W. 178: ''When the master is present, the doctrine of equal knowledge and assumed risk that is sometimes invoked in cases like this to relieve the master, should be sparingly applied. The position of the two is very different; and out of this difference grows the right of the servant to depend upon the master, if he be present directing the work, as he has a right to presume he will warn him of danger and save him from needless exposure to injury or death.''

In Illinois Central Railroad Co. v. Langan, 116 Ky. 318, 76 S. W. 32, 25 Ky. Law Rep. 500, a case in which the court was considering the question of assumed risks and assurances of the master, it is said: ''We understand the rule on this subject to be that if the danger or risk is such that a prudent man would have refused to do the work under the circumstances because of the danger, then the servant will act at his peril in undertaking it. But where the probability of injury is such that the minds and judgments of prudent men might well differ upon the certainty of

its happening or with regard to whether the force
or appliances are reasonably safe or adequate to the
performance of the task, and where the master in-
sists after objection, that the servant proceeded with
the work, or assures him that the force is adequate
or the machinery safe, then the servant has a right
to rely upon the master's presumed superior knowl-
edge. The risk is thereby assumed entirely by the
master, and he impliedly assures the servant, who
relies upon his statement, or who obeys his positive
direction, that if he, the master, is in error as to the
safety he would indemnify  the  obedient servant
against the consequences." To the same effect is
Western Union Tel. Co. v. Holtby, 93 S. W. 652, 29
Ky. Law Rep. 523; Keen v. Keystone, etc., Lumber
Co., 118 S. W. 355; Pullman Co. v. Geller, 128 Ky. 72,
107 S. W. 271, 32 Ky. Law Rep. 884; Long's Adm'r.
v. Illinois Central R. Co., 113 Ky. 806, 68 S. W. 1095,
24 Ky. Law Rep. 567, 58 L. R. A. 237, 101 Am. St.
Rep. 374; Labatt on Master & Servant, Sec. 440.

In Thompson on Negligence, Sec. 4664, it is said:
"It may be collected from the almost unanimous
current of judicial authority that, if the servant com-
plains of or directs attention to a defect or danger
in the place where he is required to work, or in the
tools, machinery, or appliances with which he is re-
quired to work, and thereupon the master, or his rep-
resentative, assures him that he can proceed without
danger and requests or commands him to continue
his work, the servant will not, as a matter of law, be
put in the position of having accepted the risk, or
of having been guilty of contributory negligence, be-
cause of relying upon the presumedly superior
knowledge of his master or of his master's represen-
tative, and continuing the work. The servant will

not be imputable with wrong for thus acting upon the advice or assurance of the master or of his vice principal, nor will it lie in the mouth of the master to impute blame to the servant for so doing. So it has been held that a servant has a right to rely on the superior judgment of the master in directing certain work to be done in a particular way, although the servant knows the dangerous character of the work, unless the danger is so manifest that no reasonably prudent man would undertake it in the same situation.''

In Sherman & Redfield on Negligence, Sec. 186, it is said: ''The true rule in this, as in all other cases is that if the master gives the servant to understand that he does not consider the risk one which a prudent person should refuse to undertake, the servant has a right to rely upon his master's judgment, unless his own was so clearly opposed thereto that, in fact, he does not rely upon the master's opinion. So, if the peculiar risk of the act commanded by the master is not obvious, the servant has a right to assume that he is not sent into any unusual peril, and he is not bound to investigate into the risk, before obeying his orders. A servant is not called upon to set up his own unaided judgment against that of his superiors; and he may rely upon their advice and still more upon their orders, notwithstanding many misgivings of his own. The servant's dependent and inferior position is to be taken into consideration; and if the master gives him positive orders to go on with the work, under perilous circumstances, the servant may recover for an injury thus incurred, if the work was not obviously so dangerous that no man of ordinary prudence would have obeyed.''

Without discussing further this branch of the case, we are well satisfied that the evidence was sufficient

to authorize the submission of the case to the jury, and that the jury had the right to say whether or not Armstrong in continuing the work assumed the hazard to such an extent as to deny him the right to recover. The attention of the jury was particularly and correctly directed to this feature of the case in instructions Nos. 3 and 4 where they were told that:

(3) "If they believed from the evidence that the stirrup upon the piling was defective, or in the act of breaking or giving away, and the plaintiff was assured by Brashear or Boling, his superiors, that it would hold until a new one could be furnished, and ordered the plaintiff to proceed with the work, and the plaintiff relied upon the superior knowledge of said Brashear or Boling in regard to the matter, and did proceed with the work, and was afterwards injured by reason of the breaking of the stirrup, the fact that he continued at said work under the circumstances would not preclude him from a recovery, unless the jury believed from the evidence that the dangerous condition of the stirrup was eminent or manifest to a person of ordinary prudence as set out in instruction No. 4, in which case the law is for the defendant."

(4) "If they believed from the evidence that the stirrup upon the piling on which plaintiff was working was defective, and in an unsafe condition, and this fact was eminent or manifest to a person of ordinary prudence, then the fact that the plaintiff may have been ordered to continue the work by his superiors, or assured that said work or appliances were safe, would not authorize the plaintiff to continue the work under such conditions; and if the dangerous or unsafe condition of the stirrup was eminent or manifest to a person of ordinary prudence, and

plaintiff still continued to work under these conditions, then he cannot recover in this action although he may have been ordered to continue the work or have been assured that said work and tools were safe by his superiors."

It is next insisted for the appellant that the verdict is excessive. That appellee was seriously and painfully injured is conceded. Whether or not his injuries are permanent is left in some doubt by the conflicting testimony of the numerous physicians who attended on and examined him. The verdict is a substantial one, and if the weight of the evidence did not show that his injuries were permanent, we would be inclined to say it was excessive. But four physicians qualified to express an opinion upon the subject, after examining the appellee, have testified that his injuries are permanent. At the time he was injured, appellee was a robust, vigorous man about 21 years of age, who had always enjoyed good health, and he had the right to believe that he would enjoy many years of continued good health. When injured he weighed about 170 pounds, but at the time of the trial some 14 months afterwards his weight had been reduced to 140 pounds. His right kidney was severely injured and several of his ribs dislocated. The kidney is one of the vital organs of the body and serious and permanent injury to it is always attended with dangerous consequences. The weight of the medical evidence is that the strength and vigor of appellee has been permanently impaired, and this being so, considering his age, physical condition, probability of life, and earning capacity, the verdict is not excessive.

Wherefore the judgment is affirmed.